IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

NANCY L. WISLON,                    )
                                    )
                    Plaintiff       )
                                    )
        vs.                         )       Civil Action No. 08-00007
                                    )
MICHAEL J. ASTRUE,                  )
COMMISSIONER OF SOCIAL              )
SECURITY,                           )
                                    )
                    Defendant       )


MEMORANDUM OPINION

CONTI, District Judge


**I.  Introduction**

        Pending before the court is an appeal from the final decision of the Commissioner of

Social Security ("Commissioner" or "defendant") denying the claim of Nancy L. Wilson

("plaintiff") for disability insurance benefits ("DIB") under Title II of the Social Security Act

("SSA" or the "Act"), 42 U.S.C. §§ 404, et seq., and supplemental social security income ("SSI")

under Title XVI of the Act, 42 U.S.C. §§ 1381, et seq.  Plaintiff asserts that the decision of the

administrative law judge (the "ALJ") that she has not been disabled since March 14, 2003, and

therefore not entitled to benefits should be reversed, because the ALJ's decision is not supported

by substantial evidence.  If not reversed, plaintiff asserts that her case should be remanded for a

new hearing before a different ALJ, because a credibility determination by the same ALJ would

preclude plaintiff from rehabilitating her own credibility.  Defendant asserts that the decision of

the ALJ is supported by substantial evidence.  The parties filed cross-motions for summary

judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure. After review of the

ALJ's decision, the submissions of the parties, and the record before the court, the court will

deny the motions of summary judgment of defendant and plaintiff and will grant plaintiff's

motion for remand for further proceedings by the ALJ: 1) to address the severity of plaintiff's

mental impairments, including plaintiff's diagnoses of dysthymic disorder, personality disorder

and anxiety and the side effects of her medications, 2) to correct factual errors with respect to

plaintiff's daily activities, 3) to consider plaintiff's credibility and the weight given to the

medical opinions in light of the corrected factual errors and severity determinations, 4) to address

whether the medium exertional weight lifting limitation was an appropriate limitation, and 5) to

include all credible medical limitations in a revised hypothetical.


## II.  Procedural History

On January 19, 2006, plaintiff applied for DIB and SSI alleging disability since March 14,

2003, with a protective filing date of January 4, 2006.  (R. at 16, 292.)  Plaintiff's claims were

denied initially by defendant on May 3, 2006.  (R. at 292.)  On June 20, 2006, plaintiff timely

requested a hearing before an administrative law judge.  (R. at 40.)  The ALJ held a hearing on

March 7, 2007.  (R. at 287-348.)  Plaintiff, represented by counsel, testified at the hearing along

with a vocational expert (the "VE").  (R. at 16, 287-348.)  On May 14, 2007, the ALJ issued a

decision finding that plaintiff retained the residual functional capacity (the "RFC") to perform

her past relevant work and was not "disabled," as defined in 20 C.F.R. §§ 404.1520(g),

416.920(g), from March 14, 2003 through the date of his decision.  (R. at 16-27.)  On July 13,

2007, plaintiff filed a request for review of the ALJ's determination.  (R. at 12.)  On December

18, 2007, the Appeals Council denied plaintiff's request for review (R. at 6-9), making the ALJ's decision the final ruling of the Commissioner. (R. at 7.) Plaintiff now seeks judicial review of defendant's final determination that she is not disabled.

### III. Factual Background

#### A.      Plaintiff's Background

Plaintiff was forty-seven years old when she filed for DIB and SSI, alleging that her low back pain secondary to a 1999 motor vehicle accident, neck pain, arm and hand numbness, arthritis in her hand, left lateral epicondylitis, asthma, hearing loss, jaw bone injury, and mental health issues related to depression and anxiety limited her ability to work. (R. at 95, 129, 144-55, 202, 210, 212, 218, 222-21, 224-27, 232, 234, 236, 238-39, 242, 246-50, 252-54, 258-59, 262-65, 268-69.) Plaintiff is literate and completed a general education diploma in 1983. (R. at 292.) Plaintiff testified that she lived in her friend's trailer with him and pets that depended upon her for care. (R. at 69, 293.) Her source of income was public assistance. (R. at 56, 294.) She did not receive food stamps. (R. at 56, 294.) Plaintiff would have to reimburse the state if she received DIB or SSI. (R. at 295.)

Plaintiff 's work experience includes primarily temporary part-time positions she obtained through a temporary employment agency including: a residential home cleaner from 1987 to 1990; a dispatcher and a laborer in a bakery for four to five months in 1993; a warehouse laborer in different businesses, on and off from 1997 until 2004; an auditor of retail grocery store inventory from January 2000 until April 2002; an inserter of paper goods from September 2002 until January 2003; a candy factory worker from January 2003 until she was laid off in the

beginning of May 2003; and a telemarketing worker from January 2004 to July 2004. (R. at 56, 60, 295-300, 302, 304-05.)

For enjoyment, plaintiff noted that she read daily and went to karaoke or the movies every three months. (R. at 71.) Plaintiff reported that she was able to perform her own personal care, drive a car short distances, pay her bills, prepare meals in a microwave, use a vacuum cleaner, do laundry, and grocery shop, but that she depended on others to lift things that weigh forty pounds or more. (R. at 69-70, 72.)

She could climb about three flights of stairs before stopping to rest, walk about a quarter-mile without stopping, remain sitting for three to four hours at a time, and lift and carry between ten to twenty pounds. (R. at 71.) Without resting, plaintiff reported that she could dress herself, shower, change and make a bed. (Id.) Although plaintiff reported cramping in her fingers and lower arms after one-half hour of writing or printing, she commented that she was able to use a regular touch tone telephone, a standard size television remote control, a knife and a fork, and could tie her shoes and fasten buttons and snaps on clothing, except that she sometimes had difficulty with fastening buttons. (R. at 71-72.)

Plaintiff did not belong to any groups or clubs, but got along with her neighbors, and did not have problems dealing with people in authority. (R. at 73.) She reported that she was not able to start and complete projects or activities such as reading a book, putting a puzzle together, sewing, needlepoint or fixing things around the house, and she was not able to plan each day such as when to get up, start meals, finish household chores or go to appointments; although, she had no trouble waking as planned when she was employed. (Id.)

Plaintiff could follow instructions and directions, but at times, got confused, due to hearing loss in both ears, and needed to stop and think before carrying them out. (R. at 74.) Changes in plaintiff's daily schedule could overwhelm her, although she could "go with the flow" with respect to changes in her living arrangements and doctors. (Id.) When plaintiff felt that she was not sufficiently confident to make decisions on her own, she would seek reassurance from her daughter and friends. (Id.)

With respect to her prior work, plaintiff usually reported to work on time. She, however, reported that she had poor attendance due to breathing problems, viruses, and back pain. (Id.) She was not able to keep up with her work and was told that she was "slow." (Id.) With respect to her ability to concentrate on her prior work for extended periods of time, plaintiff reported problems with daydreaming and her inability to concentrate when someone was standing behind or over her. (R. at 75.)

Plaintiff reported that she did not need any help taking medications for her conditions which included prescriptions of one 100 mg tablet daily of Zoloft[1] for depression and one-half to

---

[1]     Zoloft is indicated in the management of major depressive disorder in adults. "A major depressive episode implies a prominent and relatively persistent depressed or dysphoric mood that usually interferes with daily functioning (nearly every day for at least two weeks); it should include at least 4 of the following 8 symptoms: change in appetite, change in sleep, psychomotor agitation or retardation, loss of interest in usual activities or decrease in sexual drive, increased fatigue, feelings of guilt or worthlessness, slowed thinking or impaired concentration, and a suicide attempt or suicidal ideation." Physicians' Desk Reference, 2578 (62nd ed. 2008). Most common side effects associated with the use for the treatment of female adults with major depressive disorder include, inter alia, dry mouth, increased sweating, somnolence, tremor, dizziness, fatigue, abdominal pain, anorexia, constipation, diarrhea, nausea, agitation, and insomnia. Id. at 2581.

one, 25 mg tablet every twelve hours, as needed, of alprazolam,[2] a generic form of Xanax, for anxiety. (R. at 74.)

Plaintiff's pain issues started in 2002 and became more noticeable in October 2004, when her "lower lumbar starting acting up" and she could not straighten up. She attributed the pain to riding in the back seat of a tractor for three hours the day before. She reported that her fingers and lower arms got tingly and her fingers and hands went numb with repetitious work. Her upper and lower back and neck tightened up such that she was unable to move her head to the left or to the right. (R. at 75). Plaintiff reported that her pain was not as severe as it had once been since she started seeing her chiropractor, Dr. Biss. She, however, still had pain in her neck muscles, shoulders, elbows, arms, wrists, hands, fingers, and lower back, when she sat or drove for prolonged periods of time. (Id.) Bending or climbing up and down ladders made her ache and lifting heavy objects made her pain spread to her upper back and through her arms. (Id.) Standing and temperature extremes also caused her pain, although walking seemed to give her relief. She indicated that her pain seems to be worse in the morning and at the end of the day. (Id.) Some days she felt pain free and other days her lower back, neck and hands would ache. (R. at 76.) Plaintiff indicated that her pain does not disturb her sleep. She, however, regularly

---

[2]    Alprazolam is "indicated in the management of anxiety disorder (a condition corresponding most closely to the DSM-III-R diagnosis of generalized anxiety disorder) or the short term use of anxiety. Anxiety or tension associated with the stress of everyday life usually does not require treatment with an anxiolytic. . . . [a]nxiety associated with depression is responsive to alprazolam." Id. at 3042-43. Side effects associated with the use of alprazolam in the treatment of anxiety disorders include, inter alia, drowsiness, lightheadedness, depression, headache, confusion, insomnia, nervousness, dizziness, dry mouth, constipation, diarrhea, nausea, vomiting, tachycardia, hypotension, blurred vision, rigidity, and tremor. Id. at 3044.

had sleep problems due to depression, shift work, and waking up due to tingling in her hands and fingers. (Id.) At times, her pain affected her ability to think and concentrate. (R. at 75.)

Plaintiff reported that she was able to relieve her pain with over-the-counter medications, i.e., two tablets of Aleve or Ibuprofen, without any side effects. (R. at 76.) Plaintiff denied using any devices such as a brace or TENS[3] to relieve her pain or assistive devices to walk. (R. at 76-77.) Alternative means plaintiff used to relieve pain included taking hot showers, walking, stretching and resting. (R. at 77.) She also reported attending physical therapy in 1996, after she was hospitalized for seven weeks when her fibula was used to replace her jaw bone. (Id.)

Plaintiff was seeing a psychologist for anxiety and depression due to loss of her job and not being able to receive work, after - despite interviewing - not receiving any calls. (Id.) Plaintiff commented that her impairments or pain limited her ability to continue to do factory, assembly line, or warehouse work, and anything to do with lifting or prolonged sitting or standing. She, however, could house-sit animals, walk dogs or cats, and drive, except for delivering heavy packages. (Id.)

### B. Plaintiff's Medical Evidence

In 1989, plaintiff's problems included a diagnosis of a history of asthma since age three, low back pain, and hearing loss. (R. at 259.) On April 8, 2002, plaintiff presented at Mercy Family Health Associates, the clinic of her primary care physician (the "PCP"), Dr. Horner, with pain under her jaw and right anterior neck. (Id.) The progress notes of Dr. Delposen, indicated

---

[3]       TENS is an abbreviation for "transcutaneous electrical nerve stimulation" which is indicated in the management of pain by interfering with the transmission of painful stimuli. Taber's Cyclopedic Med. Dict., 2218 (20th ed. 2005).

plaintiff's history of a fracture and surgery of the left mandible. There was right anterior cervical lymphadenopathy and tenderness with palpation of the right submandibular region. (R. at 229.)

On September 27, 2004, the consultation record from Hitson Family Chiropractic noted plaintiff's stiffness, fatigue and broken jaw. (R. at 95.) On November 12, 2004, Dr. Horner's treatment record noted that there was paravertabral muscle tenderness to palpation and a decrease in range of motion on both flexion and extension. The assessment was thoracic strain. (R. at 135.)

On February 10, 2005, Dr. Horner's assessment was depression, with clinical findings including a decrease in plaintiff's mood, poor self esteem, poor eye contact, and fair insight and judgment. (Id.) Dr. Horner referred plaintiff to a psychiatrist, Dr. Ryan, M.D., who examined plaintiff on July 1, 2005. (R. at 126.) Plaintiff described chronic back pain, an emotionally abusive male relationship during the past ten years, and week-end binge drinking with habitual use of marijuana. (Id.) Dr. Ryan noted a past medical history of a significant scoliosis[4] condition and asymmetric facial bones, and that plaintiff, at the time of the examination, was well oriented, alert and cooperative with no significant depression or anxiety symptoms. (Id.) Plaintiff's reality contact was excellent, and her speech pattern was rational and coherent. (Id.) She had no impairment of concentration, comprehension, or attention span. (Id.) Her response to Dr. Ryan was relevant with good eye contact. Rapport was easily maintained, her insight was good and her judgment was considered adequate. Dr. Ryan estimated plaintiff's cognitive ability to be low

_____

[4]     Scoliosis indicates "a lateral curvature of the spine." Id. at 1959.

average.  (Id.)  Dr. Ryan's diagnosis was dysthymic disorder[5] and polysubstance abuse on Axis I,

dependent personality disorder[6] at Axis II, pulmonary insufficiency and kypohscoliosis[7] at Axis

III, moderate stress connected with present relationship and substance abuse problems at Axis III,

and a Global Assessment of Functioning (the "GAF") estimate of 50[8] at Axis V.  (Id., 27.)

On July 22, 2005, Dr. Horner diagnosed plaintiff with depression and prescribed Zoloft in

the treatment of plaintiff's decreased mood and increased anxiety.  (R. at 132.)  On July 29, 2005,

---

[5]     Dysthymic disorder indicates a "chronically depressed mood that occurs for most of the day more days than not for at least 2 years."  See American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR) 376-77 (4th ed. 2000). Symptoms include poor appetite or overeating, insomnia or hypersomnia, low energy or fatigue, low self-esteem, poor concentration or difficulty making decision, and feelings of hopelessness. Id. at 380-81.

[6]     Dependant personality disorder ("DPD") is marked by "a pervasive and excessive need to be taken care of that leads to submissive and clinging behavior and fears of separation. . . . [t]he dependent and submissive behaviors are designed to elicit caregiving and arise from a self-perception of being unable to function adequately without the help of others."  Individuals with DPD "have great difficulty making everyday decisions (e.g., what color shirt to wear to work or whether to carry an umbrella) without an excessive amount of advice and reassurance from others."  Id. at 721.  The "need for others to assume responsibility goes beyond age-appropriate and situation-appropriate requests for assistance from others." Id.

[7]     Kyphoscoliosis indicates a "lateral curvature of the spine accompanying an anteroposterior hump."  Taber's Cyclopedic Med. Dict., 1185 (20th ed. 2005).

[8]     The GAF assesses an individual's psychological, social and occupational functioning with a score of 1 being the lowest and a score of 100 being the highest.  A GAF score of between 50-60 denotes moderate impairment.  The GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR) 34 (4th ed. 2000); see Lozada v. Barnhart, 331 F. Supp.2d 325, 330 n.2 (E.D. Pa. 2004). An individual with a GAF score of 60 may have "moderate symptoms" or "moderate difficulty in social, occupational, or school functioning;" of 50 may have "[serious symptoms (e.g., suicidal ideation . . .)" or "any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job);" of 40 may have "some impairment in reality testing or communication" or "major impairment in several areas, such as work or school, family relations, judgment, thinking or mood."  (Id.)

plaintiff 's counselor at the Comprehensive Counseling Center at Westmoreland Regional Hospital, Diane Muka, M.A. ("Muka") reported educating plaintiff on the topic of depression with notations related to becoming more assertive in genera.  Plaintiff was administered the Zung depression scale[9] and scored in the mild range.  Muka noted that plaintiff's PCP had resumed plaintiff's Zoloft prescription.  (R. at 123.)

On August 25, 2005, Dr. Horner noted plaintiff's history of physical abuse, ongoing therapy, counseling, and continuing jaw dysfunction, back pain, arthritis, hand pain, anxiety and depression.  (R. at 131.)  On August 26, 2005, Muka's progress notes indicated  plaintiff's report of continuing to decrease her usage of alcohol and marijuana and that her PCP had increased her Zoloft prescription to 100 mg.  Plaintiff reported anxiety symptoms and Muka noted educating plaintiff on the topic of anxiety disorder.  (R. at 122.)

On November 9, 2005, the assessment of plaintiff's chiropractor, Dr. Biss included cervicalgia, radiculitis (thoracic), and myofibrosis, with findings of palpation to tenderness, spasm and subluxations.  Her prognosis was fair.  (R. at 130.)

On December 5, 2005, Dr. Horner's treatment notes documented plaintiff's mood and tearful affect with an assessment of depression.  (Id.)  On December 23, 2005, Dr. Horner completed an employability assessment form for the purpose of plaintiff obtaining medical

---

[9]        The Zung depression scale is an objective rating instrument that evaluates depression, anxiety, hostility, phobias, paranoid ideation, obsessive compulsiveness and others. See http://medical-dictionary.thefreedictionary.com/Zung+depression+scale (citing Gale Encyclopedia of Medicine (2002).  The court is not able to assess the import of plaintiff's score in the mild range of the scale.

assistance (R. at 264) and opined that secondary to plaintiff's depression, domestic violence, jaw dysfunction and arthritis, plaintiff was precluded from any gainful employment until November, 2006.  (Id.)  Dr. Horner's assessment was based upon her physical examination of plaintiff and her review of plaintiff's medical records.  Dr. Horner noted that plaintiff was seeing a therapist and not achieving the expected goals.  (Id.)

On January 9, 2006, treatment notes of plaintiff's walk-in emergency room visit indicated symptoms of depression, hopelessness, sleep disturbance, anxiousness, irritability, tearfulness, mood swings, racing thoughts, paranoid ranting, and ineffective coping secondary to an argument with her daughter and boyfriend.[10]  (R. at 144-54.)  A treating physician, Dr. Wissinger, diagnosed plaintiff with an anxiety attack.  (R. at 154.)  Plaintiff was discharged with follow-up instructions to arrange comprehensive counseling in a partial hospitalization program.  (Id., 155.) Plaintiff reported that her last use of marijuana was on January 8, 2006.  (R. at 149.)  Her blood tested positive for cannabinoids.[11]  (R. at 156.)

---

[10]    The import of treatment notes relating to "bipolar," plaintiff's refusal to sign "201", and no grounds for "302" is not clear from the record.  (R. at 144-54, 149.)

[11]    Cannabinoids indicate "chemical compounds that are the active principles in marijuana."  See http://medical-dictionary.thefreedictionary.com/cannabinoids (citing Gale Encyclopedia of Medicine (2008 ); see generally Taber's Cyclopedic Med. Dict., 1304 (20th ed. 2005).

On February 28, 2006, Dr. Horner added Xanax to plaintiff's medication regime. (R. at 129.) The treatment notes indicated asthma that was complicated by smoking, problems with depression and anxiety, and additional prescriptions of Advair and Zoloft. (Id.)

On March 2, 2006, case evaluation and recommendation notes from Hitson Family Chiropractic, indicate that plaintiff's major complaint precipitated from trauma related to car accidents and included numbness in both arms, neck pain, thyroid issues, and fatigue, with basic underlying chiropractic troubles of muscle spasms, loss of cervical curve, degenerative joint disease, and subluxation. (R. at 98.) On March 3, 2006, Dr. Biss reported that plaintiff's residual function capacity (the "RFC") was such that she could frequently lift or carry two to three pounds, could stand/walk one to two hours, could sit for eight hours with an alternating sit and stand option, was limited in upper extremity pushing or pulling, would exacerbate her cervical and thoracic regions with repetitive motion, could never stoop, crouch or balance, and was affected by reaching and handling in her impairments in that repetitive motion and reaching aggravated her condition. (R. at 113-44.)

On March 16, 2006, a licensed audiologist, Christopher Eckert, reported to Dr. Horner that an audiometric evaluation revealed a mild to moderate sensorineural hearing loss bilaterally and that speech discrimination scores at the conversational level were poor. (R. at 138.) On March 28, 2006, Dr. Horner diagnosed plaintiff with asthma, hearing loss and depression. (R. at 224.) On May 1, 2006, Dr. Horner reported that, based upon her assessment of plaintiff's clinical history and secondary to her diagnosis of depression, jaw dysfunction, and hearing loss, plaintiff was precluded from any gainful employment until May 2007. (R. at 263.)

On April 6, 2006, a psychologist, Dr. Perconte, examined plaintiff at the request of the Pennsylvania Bureau of Disability Determination. (R. at 158-71.) Dr. Perconte indicated that plaintiff was moderately impaired in her ability to make judgments on simple work-related decisions and moderately impaired in her ability to respond appropriately to work pressures and changes in a work setting. (R. at 160-61.) Dr. Perconte opined that plaintiff's grooming appeared marginal, her insights and judgment were limited, and that mild impairment in her capacity to understand, retain, and follow instructions may be further impaired by her poor motivation and characterilogical problems. (R. at 167, 169.) Dr. Perconte stated that plaintiff had a mild overall impairment in her capacity to sustain attention and to perform simple, repetitive tasks, and her reliability in most areas appeared to be rather poor. (R. at 169.) He considered plaintiff's communication skills, emotional stability, and overall prognosis to be fair. (R. at 170.) Coping skills were determined to be below average, reflecting plaintiff's "concrete thinking at times." (Id.) Dr. Perconte indicated that, at the time of the examination, plaintiff never appeared to have shown significant or severe symptoms of depression or depressive disorder, and that her previous depressive symptoms were, in part, caused or exacerbated by her characterological problems and possible alcohol abuse. (Id.) Diagnostic impressions on Axis I were (300.4) dysthymic disorder, (305.00) rule out alcohol abuse by history, and (301.6) dependent personality disorder, with an Axis V current GAF of 60, indicating a highest of 65 and the lowest of 50. (R. at 170-71.)

On April 20, 2006, a family practitioner, Dr. Ragoor, M.D., examined plaintiff at the request of the Pennsylvania Bureau of Disability Determination. (R. at 173-84.) Dr. Ragoor noted that plaintiff's past medical history included asthma from childhood, depression from

13

February 2005, low back pain from 2002, and problems with her left hand and fingers from the last five to seven years. He noted that her medications included 100 mg a day of Zoloft, 250/50 mcg of Advair[12], one puff b.i.d.[13], two puffs of Proventil MDI[14] t.i.d. p.r.n.[15], 0.25 mg of Xanax, p.o. t.i.d. p.r.n., Tylenol, and Motrin for pain. Dr. Ragoor attributed most of plaintiff's problems to her depressed mood, flat affect and low energy, with some loss of assertiveness and concentration problems and trouble following through with any plans. (R. at 170-71, 176.) With respect to plaintiff's lumbosacral spine, Dr. Ragoor noted that plaintiff was able to do forward flexion "all the way down," more than 90 degrees and close to120 degrees. There was no restriction on extension or lateral flexion on lumbosacral spine. She also had a good range of motion in her cervical spine. Dr. Ragoor determined plaintiff's memory to have fairly good retention recall. (R. at 176.) He assessed plaintiff's maximum sustainable physical capacity to

---

[12]     Advair is a brand drug "indicated for the long-term twice-daily maintenance treatment of asthma in patients four years of age and older." Physicians' Desk Reference,1285-89 (62nd ed. 2008). Overall adverse events include, inter alia, upper respiratory tract infection, pharyngitis, upper respiratory inflammation, sinusitis, viral respiratory infections, bronchitis, cough, headaches, nausea, vomiting, gastrointestinal discomfort and pain, diarrhea, and musculoskeletal pain. Id. at 1293.

[13]     The abbreviation b.i.d. is for the Latin phrase, "bis in die" which on medical on prescriptions indicates a dosage of twice (two times) a day. See http://www.medterms.com/script/main/art.asp?articlekey=8309.

[14]     Proventil (inhalation aerosol) is a brand drug "indicated in patients twelve years of age and older, for the prevention and relief of bronchospasm in patients with reversible obstructive airway disease, and for the prevention of exercise-induced bronchospasm." Physicians' Desk Reference, 3001-02 (62nd ed. 2008). Adverse effects include, inter alia, tremors, dizziness, nervousness, headache, insomnia, nausea, bronchospasm, cough and bronchitis. Id. at 3004.

[15]     The abbreviation t.i.d. p.r.n. is for the Latin phrase, "ter in die" and "pro re nata " which on medical on prescriptions indicates a dosage of three times a day as needed. See http://www.medterms.com/script/main/art.asp?articlekey=8309.

engage in full-time employment in a regular work setting as an ability to occasionally lift or carry two to three pounds, to cumulatively stand or walk for one hour or less a day, to sit less than six hours, and that she had limited ability to push and pull hand or foot controls.  (R. at 178.)  Dr. Ragoor indicated that plaintiff could occasionally perform postural activities like bending, kneeling, stepping, crouching, balancing and climbing.  (R. at 179.)  He indicated that plaintiff had no other limitations with respect to physical functions or environmental restrictions.  (Id.)  Dr. Ragoor diagnosed plaintiff with mechanical low back pain, right knee osteoarthritis, bilateral wrist early arthritis, left elbow epicondylitis, depression, asthma, and left jaw fracture with bone graft from mild temporal mandibular dysfunction.  (R. at 176.)

Also on April 20, 2006, a medical consultant, Dr. Dalton, Ph.D., assessed plaintiff's medical psychiatric evidence with respect to her capacity to function or be limited, with the instruction to be especially careful to explain conclusions that differed from those of treating medical sources or from  plaintiff's  allegations.  (R. at 197.)  Dr. Dalton indicated plaintiff's file contained evidence to support a medically determinable impairment of 1) dysthymic disorder, which did not precisely satisfy the diagnostic criteria under the category 12.04, related to affective disorders, and 2) a medically determinable impairment of dependant personality disorder  which did not precisely satisfy the diagnostic criteria under the category 12.08, related to personality disorders.  (R. at 184.)  Dr. Dalton's indicated that his determination of plaintiff's RFC was consistent with the opinion of Dr. Perconte, Ph.D., contained in the report received on March 24, 2006.  Dr. Dalton found plaintiff's statements to be partially credible and opined that plaintiff could perform the basic mental demands of competitive work on a sustained basis.  (R. at 199.)

On July 10, 2006, a physical therapist, Tim Meszar, P.T., evaluated plaintiff.  (R. at 248-50.)  Plaintiff reported experiencing discomfort for the past year with regard to left forearm and shoulder pain, functional limitation towards lifting, reading, household chores, carrying items, and frequent sleep disturbances.  She also reported numbness and weakness to the left arm that was not alleviated by chiropractic treatments, although she was able to get relief with medications and moist heat.  (R. at 248.)  Mr. Meszar's preferred practice pattern included musculoskeletal pattern E, impaired joint mobility, muscle performance, and range of motion associated with ligament, etc.  Plaintiff was determined to have good rehabilitation potential to meet the established goals to decrease her pain, to increase her cervical, left shoulder, and wrist range of motion, decrease her perceived disability, and to verbalize and demonstrate independence with a home exercise program for self-management.  (R. at 249.)

On July 21, 2006, Dr. Horner, noted that plaintiff's problems included elbow, neck pain and Achilles tendonitis.  (R. at 222.)  On August 30, 2006, Dr. Horner's assessment included plaintiff's cervicalagia, neck pain, elbow pain, depression and anxiety.  (R. at 221.)  On September 6, 2006, the physical therapist, Mr. Meszar, diagnosed plaintiff with left shoulder and elbow tendinitis including impaired joint mobility, muscle performance and range of motion associated with connective tissue dysfunction.  (R. at 246.)  Her functional limitations included lifting, reading, household chores, carrying items, standing and walking.  (Id.)  Objectively, there was tenderness, trigger points, and hypertonicity to the left shoulder and forearm musculature.  The plan was directed towards increasing plaintiff's range of motion to the left shoulder and forearm musculature.  (Id.)

On October, 31, 2006, Meszar's diagnosis included cervicalgia and foot tendonitis, with complaints of pain in the neck, left shoulder and right ankle. (R. at 242.) Plaintiff reported functional limitations in lifting, reading, driving and heavier house management. (Id.) Her prognosis was good rehabilitation potential, with no overt barriers to a successful outcome. The goals included decreasing plaintiff's pain, increasing her cervical and upper extremity range of motion, and increasing her upper extremity strength. (Id., 243.) The physical therapy progress notes of November 9, 2006, reflected that plaintiff was experiencing neck spasms. (R. at 241.)

On December 21, 2006, Dr. Wang, M.D., performed a psychiatric evaluation of plaintiff. (R. at 252-54.) Plaintiff reported that she had been struggling with depression for a long time, but only started Zoloft in the beginning of 2005. (R. at 252.) She also reported taking Xanax. Dr. Wang's mental status examination indicated that plaintiff was alert and oriented at the examination, with an anxious mood which she demonstrated mood congruent affect. (R. at 254.) Her insight into her current symptoms, judgment for everyday living, and impulse control was rated as fair. (Id.) Dr. Wang diagnosed plaintiff with depressive disorder NOS[16] (not otherwise specified) with rule out of cyclothymic disorder on Axis I, moderate to severe on Axis IV, and a

---

[16]     The depressive disorder NOS (not otherwise specified) "category includes disorders with depressive features that do not meet the criteria for Major Depressive Disorder, Dysthymic Disorder, Adjustment Disorder With Depressed Mood, or Adjustment Disorder with Mixed Anxiety and Depressed Mood. Sometimes depressive symptoms can present as part of an anxiety disorder not otherwise specified." See American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR) 381 (4th ed. 2000) (internal citations omitted). Examples of depressive NOS include, "premenstrual dysphoric disorder," "minor depressive disorder," "recurrent brief depressive disorder," "postpsychotic depressive disorder of schizophrenia," "major depressive episode superimposed on delusional disorder," "psychotic disorder not otherwise specified, or the active phase of schizophrenia," and "situations in which the clinician has concluded that a depressive disorder is present but is unable to determine whether it is primary, due to a general medical condition, or substance induced." Id. at 381-82.

GAF of 60 on Axis V and advised plaintiff to continue taking Zoloft and to follow up with her

PCP.  (Id.)

### C.    Vocational Evidence, Hypothetical

The ALJ told the VE that plaintiff was forty-eight years old, and at her alleged onset,

would have been a forty-four-year old, "younger person under our regulations" with a general

education diploma from 1983.  (R. at 335.)  The VE was told that plaintiff had prior relevant

work as a warehouse worker or warehouse laborer, candy factory laborer, bakery laborer,

dispatcher, printing inserter, inventory scanner or grocery store auditor, and housekeeper/cleaner.

(Id., 336-38.)  The ALJ asked the VE to consider a

> hypothetical individual of the same age, education and work
> experience as the claimant.  This person would be limited to no
> more than the medium range of exertion, as that is defined in our
> regulations.  No climbing, ropes, ladders, scaffolds, unless less
> than four steps.  In other words, a stool or ladder up to four steps is
> impermissible.  No more than occasional balancing.  If you
> consider any sedentary occupations, they must be compatible with
> a sit/stand and walk option, defined as no more than five steps
> from the work station, performing a stretching maneuver returning
> within on minute, no more than five times each hour.  All right.
> Must avoid prolonged exposure to fumes, dust, odors and gases,
> and by this I'm talking about obnoxious fumes or odors, I'm not
> talking about a steak cooking or something like that, I'm talking
> about solvents.  I'm talking about cleaning fluids.  I'm talking
> about various kinds of soap, floor wax that has solvents in it, that
> type of thing.  No prolonged exposure to those things.. . .
> . . .
> That's the RFC.

(R. at 338-40) (emphasis added.)

The VE testified that the hypothetical individual would be able to perform as a warehouse

worker, a candy factory worker, a dispatcher, a print inserter, an inventory clerk (as discussed),

and a housekeeper.  (R. at 340-41.)  Assuming that the hypothetical person could not do any of the aforementioned jobs, the VE testified that the hypothetical person could perform other occupations which existed in either the national economy or in the local economy, defined as Allegheny, Beaver, Westmoreland, Green, Fayette, and Washington counties.  (R. at 341-42.) These occupations included: a season sorter in a nursery or green house setting, a washer position in an industrial setting, a cashier/toll collector in a parking garage, a small parts assembler, a boarder clerk, and a mail sorter.  (Id.)  The VE testified that an employer engaged in a competitive situation would normally require in terms of commitments from an unskilled employee to generally work seven to eight hours a day, thirty-five to forty hours per week, with two, ten-minute to fifteen-minute breaks per shift and a thirty-minute lunch break.  (R. at 342-43.)

The VE also testified:

> VE: Generally, if an individual is (inaudible) ten percent of the time on a regular pay period that will become noticeable to the supervisor and compromise full-time, competitive employment on a sustained basis.
>
> ALJ: Okay.  When you say compromise it on a sustained basis, it sounds like you're not only talking about getting fired from the job the person has, but getting another job, not being able to meet the time requirements, getting fired, getting a third job, etcetera, etcetera, would that be correct?
>
> VE: That would be correct, Judge.
>
> ALJ: Okay.

(Id.)

In response to questions posed by plaintiff's counsel, the VE responded that: 1) if a person could only lift and carry up to two or three pounds, the full-time competitive basis of the available jobs, except for a cashier position, would be compromised, 2) if a person could only stand and walk one hour or less in an eight-hour day, the medium exertional level jobs would be compromised, except for a cashier's position, but the sedentary positions would not be compromised, 3) if a person could only sit for six hours or less in an eight-hour day, the medium duty jobs would be compromised, the sedentary jobs may or may not be compromised, but a cashier position should not be compromised, 4) a person who could not stoop, crouch, balance or climb would generally impact the "medium (inaudible)." (R. at 344.) The VE indicated that she would have to go through each Dictionary of Occupational Titles (the "DOT") number to tell if any of the "jobs have been (inaudible) sedentary. (Id.) The ALJ asked for clarification:

ALJ:        I'm sorry.

ATTY:       Can't stoop, crouch, balance or climb.

ALJ:        And that would compromise the medium?

VE:         Not [sic] just the sedentary, and not all of light.

ALJ:        Okay, all right. Ma'am I understand that the
            sit/stand/walk that I required is not addressed in the
            DOT, is that correct?

VE:         Yes, Judge.

ALJ:        And where did you obtain the expertise to speak
            authoritatively on that issue?

VE:         (Inaudible) more than 10% of the time I'm
            (inaudible).

| ALJ: | Okay. Other than on that issue, are you aware of any inconsistencies between your professional opinions today and the Dictionary of Occupational Titles. |
|---|---|
| VE: | No, Judge. |

## IV. Standard of Review

If review is denied by the Appeals Council, the decision of the administrative law judge is considered the final decision of the Commissioner. Matthews v. Apfel, 239 F.3d 589, 592 (3d Cir. 2001). The Commissioner's application of the law receives plenary review. Monsour Med. Ctr. v. Heckler, 806 F.2d 1185, 1191 (3d Cir. 1986). Findings of fact are reviewed for substantial evidence. See 42 U.S.C. § 405(g) (2000). The Commissioner's denial of benefits must be supported by substantial evidence on the record as a whole. Newell v. Comm'r of Soc. Sec., 347 F.3d 541, 549 (3d Cir. 2003) (citing Podedworny v. Harris, 745 F.2d 210, 221 (3d Cir. 1984)); see Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Newell, 347 F.3d at 545. Although substantial evidence is more than a mere scintilla, it need not rise to the level of a preponderance. Id.

## V. Discussion

Under Title XVI of the SSA, a disability is defined as the inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period or not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A),

1382c(a)(3)(A). A person is unable to engage in substantial gainful activity when her "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other king of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B).

In order to make a disability determination under the SSA, a five-step sequential evaluation must be applied. 20 C.F.R. §§ 404.1520, 416.920. The evaluation consists of the following stages: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment; (3) if so, whether the claimant's severe impairment meets or equals the criteria of an impairment listed in 20 C.F.R., pt. 404, subpt. P, app. 1; (4) if not, whether the claimant's impairment prevents him from performing his past relevant work; and (5) if so, whether the claimant can perform any other work which exists in the national economy in light of his age, education, work experience and residual functional capacity. 20 C.F.R. §§ 404.1520, 416.920; Sykes v. Apfel, 228 F.3d 259, 262-63 (3d Cir. 2000). If a plaintiff fails to meet the burden of proving the requirements in the first four steps, the administrative law judge may find that the plaintiff is not disabled. Burns v. Burnhart, 312 F.3d 113, 119 (3d Cir. 2002). The Commissioner is charged with the burden of proof with respect to the fifth step in the evaluation process. Id.

A. The ALJ's Opinion

Here, the ALJ found that: (1) plaintiff meets the non-disability requirements for a period of disability and disability insurance benefits set forth in section 216(i) of the SSA through September 30, 2007 and had not engaged in substantial gainful activity since allegedly becoming

disabled on March 14, 2003; (2)(a) plaintiff had the severe impairment of low back pain secondary to a 1999 motor vehicle accident which had more than a de minimis effect on plaintiff's ability to perform basic work activities, and (b) plaintiff did not have severe disabling impairments of neck pain, numbness of the hand nor elbow, asthma, reduced hearing, or mental health symptoms because these conditions did not have more than a de minimis effect on plaintiff's ability to perform basic work activities; (3) plaintiff did not have an impairment or combination of impairments that meets or medically equals any of the criteria in Listing 1.00 or any other listed impairment set forth in 20 C.F.R. pt. 404, subpt. P, app. 1, reg. 4; (4) plaintiff had the RFC to perform work at the medium exertional level that affords a sit/stand option and permits the claimant to take four or five steps away from her workstation during a one-minute period up to five times an hour if working at the sedentary exertional level, is limited to occasional balancing and must avoid climbing on ladders, ropes or scaffolds higher than four steps, must avoid prolonged exposure to fumes, noxious odors, dusts and noxious gases, must avoid prolonged exposure to cold temperature extremes and extreme wetness and humidity, and was able to perform her past relevant work as a candy factory worker, bakery laborer, dispatcher, inserter, inventory clerk, and clear/housekeeper, and 5) plaintiff could perform a number of jobs at the sedentary, light and medium exertional levels, of which locally 5,402 such jobs existed and nationally 894,398 such jobs existed.

### B. Plaintiff's Arguments

Plaintiff makes five arguments: 1) the ALJ failed to apply the proper legal standard to the analysis of plaintiff's symptomatology and her functional limitations due to errors in the ALJ's determination about plaintiff's credibility relating to the intensity, duration, and timing effects of

her symptoms; 2) the ALJ erred in concluding that plaintiff's mental impairments, neck pain, left lateral epicondylitis, arthritis, upper extremity pain and numbness, history of asthma, and hearing impairment failed to pass the de minimus threshold of step two; 3) the ALJ failed to evaluate properly the opinions of plaintiff's treating and examining medical sources in derogation of 20 C.F.R. §§ 404.1527 and 416.927 and Social Security Rulings 96-2p, 96-5p, and 06-03p; 4) the ALJ failed to consider properly the severity of plaintiff's medical condition which impaired his analysis at step three, four and five of the inquiry; and 5) the ALJ erred in the characterization of plaintiff's RFC because the ALJ's findings are not supported by substantial evidence and the hypothetical question relied upon by the ALJ did not reflect the specific capacity/limitations established by the administrative record.

The court will consider first whether the ALJ erred at step two of the sequential analysis and second will consider whether the ALJ erred in evaluating the medical opinions with respect to plaintiff's exertional limitations.

### 1.      Step Two:  Severity

The ALJ concluded that the effects of claimant's low back pain secondary to a 1999 motor vehicle accident constituted a severe impairment, but that her other impairments were not severe.  Plaintiff argues that the ALJ erred in concluding that plaintiff's mental impairments, neck pain, left lateral epicondylitis, arthritis, upper extremity pain and numbness, history of asthma, and hearing impairment failed to pass the de minimus threshold of step set forth in 20 C.F.R. § 404.1529(c)(3)(i)-(vii), 416.929(c)(3)(i)-(vii).  Plaintiff also argues that the combined affects of these impairments should be considered a disability.

The burden placed on an applicant at step two is not an exacting one. Although the regulatory language speaks in terms of "severity," the Commissioner has clarified that an applicant need only demonstrate something beyond "a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work." McCrea v. Comm'r of Soc. Security, 370 F.3d 357, 360 (3d Cir. 2004) (citing SSR 85-28, 1985 WL 56856, at *3); Newell, 347 F.3d at 546 ("If the evidence presented by the claimant presents more than a 'slight abnormality,' the step-two requirement of 'severe' is met."). Reasonable doubts about whether a "severity" showing has been made is to be resolved in favor of the claimant. Newell, 347 F.3d at 547.

Under the applicable regulations, an impairment or combination of impairments is severe if it significantly limits an individual's ability to perform basic work activities. 20 C.F.R. §§ 404.1521, 416.921. For an impairment to be severe, it must have more than a de minimus effect on the claimant. Id.

At this juncture, the court will limit its discussion about whether the ALJ adequately evaluated the severity of plaintiff's mental impairments. The ALJ determined that plaintiff's mental impairments were not "severe" because she did not have a mental health disorder that had more than a de minimus effect on her ability to perform basic work activities. (R at 20-22.) The ALJ commented that the medical source opinions of Dr. Ryan, Dr. Horner, Dr. Perconte, and Dr. Wang evidenced that plaintiff's mental impairments did not impose any significant limitations on plaintiff's ability to perform basic work activities because they were successfully controlled with medication. (R. at 22.) Although the ALJ acknowledged certain evidence in his determination that plaintiff's mental impairments were not severe, the ALJ failed to articulate adequately his

25

reasons for discounting other substantial evidence related to the opinions of Dr. Ryan, Dr. Horner, Dr. Perconte and Dr. Wang, and Dr. Ragoor. For example, the ALJ concluded that Dr. Ryan's mental status examination of plaintiff in July 2005 was generally unremarkable without any indication of significant depression or anxiety (R at 20). Dr. Ryan, however, diagnosed dysthymic disorder, dependent personality disorder, and a GAF estimate of 50. The ALJ did not explain that contradictory evidence.

An administrative law judge cannot pick and choose parts of a physician's opinion without providing specific reasons for rejecting other parts. See Fetters v. Astrue, No. 07-256J, 2009 U.S. Dist. LEXIS 18346, at **10-11 (W.D. Pa.. Mar.11, 2009) (finding that the administrative law judge should have concluded that plaintiff's depression was a severe impairment where a consultative examining psychologist and the state agency medical consultant psychologist diagnosed plaintiff with depressive disorder and indicated that plaintiff's depression resulted in more than minimal restrictions on her ability to function in certain areas, and the medical evidence established that plaintiff's depression was "more than a slight abnormality," with some effect on her ability to do basic work activities); Ward-White v. Astrue, No. S-07-1616 GGH, 2009 U.S. Dist. LEXIS 18088, at *20 (E.D. Ca.. Mar.10, 2009); see also Loza v. Apfel, 219 F.3d 378, 393 (5th Cir. 2000) (administrative law judges' finding that the plaintiff's mental impairment was not severe or insignificant was not supported by substantial evidence based on the record as a whole).

Here, the ALJ relied on Dr. Horner's comments of August 2005, i.e. that plaintiff's depression was doing well on Zoloft and with her psychological therapy (R. at 131), but did not explain how Dr. Horner's subsequent notes on December 5, 2005, which documented plaintiff's

mood and tearful affect with an continued assessment of depression, would affect the August 2005 comments. The ALJ did not consider Dr. Horner's assessment of December 23, 2005, which noted plaintiff's unsuccessful progress in the achievement of expected goals set with her therapist and Dr. Horner's medical opinion that plaintiff was precluded from any gainful employment until November, 2006, secondary to plaintiff's depression, domestic violence, jaw dysfunction, and arthritis.

The ALJ did not explain how Dr. Perconte's diagnosis, upon examination of plaintiff, of dysthymic disorder and a dependent personality disorder with a GAF score of 60, would support a finding that plaintiff's mental impairments were not severe. A dysthymic disorder is related to depression in that it is a "chronic mood disturbance involving either a depressed state or a loss of interest or pleasure in almost all usual activities." Simmonds v, Heckler, 807 F.2d 54, 58 (3d. Cir. 1986). The ALJ did not adequately explain why plaintiff's diagnoses of dysthymic disorder and dependent personality disorder were not severe mental health impairments. The ALJ also did not adequately articulate his reason for rejecting plaintiff's diagnosis of anxiety. See Burnett v. Comm'r of Soc. Security, 220 F.3d 112, 121 (3d Cir. 2000).

The ALJ's conclusion that subsequent therapy notes indicated that plaintiff had improved appears inconsistent with Dr. Wang's diagnosis of December 2006 of depressive disorder not otherwise specified with a GAF of 60. That inconsistency is also not adequately explained as a basis for finding that plaintiff's mental impairments are not severe. The ALJ did not discuss Dr. Ragoor's diagnosis of depression. The record is replete with references in the medical evidence to depression and mental health disorders, GAF scores between 50-60, and the prescribed use of Zoloft. Given the record as a whole, the ALJ must explain why that medical evidence is

insufficient to support a finding of a severe mental health impairment, i.e. an impairment that is more than "a slight abnormality".  Newell, 347 F.3d. at 546.

There do not appear to be any limitations related to plaintiff's mental health conditions included in the hypothetical relied upon by the ALJ.  In Fetters, the district court found that although the administrative law judge erred in step two by not finding the plaintiff's mental health condition severe, it was harmless error because the administrative law judge included the pertinent limitations from the mental health condition in the hypothetical relied upon in reaching the determination that the plaintiff was not disabled.  Fetters, No. 07-256J, 2009 U.S. Dist. LEXIS 18346, at *11-12 (noting that the administrative law judge incorporated limitations arising from the plaintiff's depression into his residual functional capacity finding by limiting the plaintiff to "simple, routine and repetitive tasks involving simple, work-related decisions."). Here, the ALJ did not include the kind of limitations found to be appropriate for a mental health condition, such as those referenced in Fetters, and the ALJ's error cannot be found to be harmless.

This case must be remanded in order for the ALJ to explain adequately his findings of severity in light of all the pertinent medical evidence and if evidence is rejected, adequately explain his reasons for the rejection.

### 2. Weight Afforded to Medical Opinions in Determining Plaintiff's Exertional Limitations

An administrative law judge must consider all relevant evidence when determining an individual's RFC.  Fargnoli v. Halter, 247 F.3d 34, 41 (3d Cir. 2001) (finding that the disparity between the actual record and the administrative law judges' sparse synopsis of it made it

impossible for the court to review the administrative law judges' decision) (citing 20 C.R.F. §§ 404.1527(e)(2), 404.1545(a), 404.1546; <u>Burnett v. Comm'r of Soc. Sec. Admin.</u>, 220 F.3d 112, 121 (3d Cir. 2000)).  "RFC is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s)."  <u>Burnett</u>, 220 F.3d at 121 (quoting <u>Hartranft v. Apfel</u>, 181 F.3d 358, 359 n.1 (3d Cir. 1999).  In <u>Burnett</u>, the court determined that the administrative law judge erred by reason of his failure to consider and explain his reasons for discounting all of the pertinent evidence before him in making his RFC.  <u>Id.</u>  The court stated that it could not "tell if significant probative evidence was not credited or simply ignored."  <u>Id.</u>

To determine the physical exertion requirements of work in the national economy, the SSA classifies jobs as sedentary, light, medium, heavy, and very heavy.  20 C.F.R. §§ 404.1567(a)-(e), 416.967(a)-(e).  "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools."  20 C.F.R. §§ 404.1567(a), 416.967(a).  A sedentary job involves sitting, with a certain amount of walking and standing.  <u>Id.</u>  "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds."  20 C.F.R. §§ 404.1567(b), 416.967(b).  A job in the light category requires a good deal of walking or standing, or some pushing and pulling of arm or leg controls when the job involves sitting most of the time.  <u>Id.</u>  "To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities."  <u>Id.</u>  If someone can do light work, the SSA determines that they can also do sedentary work, absent any additional limiting factors.  <u>Id.</u>  "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weight up to 25 pounds."  20 C.F.R. §§ 404.1567(c), 416.967(c).  "Heavy work

involves lifting no more than 100 hundred pounds at a time." 20 C.F.R. §§ 404.1567(d), 416.967(d). "Very heavy work involves lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more." 20 C.F.R. §§ 404.1567(e), 416.967(e).

In the instant case, the ALJ determined that plaintiff had the RFC to perform medium work. After a review of the record, the court finds it impossible to determine whether the ALJ's finding that plaintiff can perform medium work is supported by substantial evidence. The ALJ did not explain sufficiently his assessment of the credibility of, and weight given to, the medical evidence and opinions from plaintiff's treating physicians that contradict his findings that plaintiff can perform medium work. Here, the medical evidence is that plaintiff could lift or carry two to three pounds. ( R. at 113-44, 178, related to the opinions of Dr. Biss and Dr. Ragoor.) There is no specific medical opinion that plaintiff could lift more than ten pounds and up to fifty pounds, which is required for medium work.

In light of the medical opinions which contradict the ALJ's determinations, the ALJ, on remand, should adequately explain his findings of plaintiff's exertional level in light of all the pertinent medical evidence and if evidence is rejected, adequately explain his reasons for the rejection. If the ALJ concludes that plaintiff can perform at the exertional level of medium, he will need to address the medical evidence in the record that supports his conclusion.

### B.    Factual Errors

The ALJ stated erroneously that plaintiff had reported that she occasionally went to "karate" in his assessment of the severity of plaintiff's impairments. The record reflects, however, that plaintiff reported that she "went to 'karaoke' once in a while - about once every

three months" (R. at 71), which would have a significantly different impact with regard to plaintiff's ambulatory abilities.  If the disability determination of an administrative law judge is based on erroneous facts, it is not supported by substantial evidence.  Brownawell v. Comm'r of Soc. Security, 554 F.3d 352, 355 (3d Cir. 2008).   The court will remand this issue to the ALJ for further consideration of the severity of plaintiff's impairments.

### C.    Inaudible Transcription of Hearing

The transcript of the administrative hearing contains several inaudible insertions within the testimony of the VE in response to hypothetical questions proposed by the ALJ.  These omissions may be pertinent to the RFC determination by the ALJ.  The court is unable to assess properly the weight the ALJ gave to the VE's responses in his determination of plaintiff's RFC and subsequent steps of the analysis in light of the inaudible portions of the transcript.

### D.    Other Issues

The other issues raised by plaintiff are inextricably intertwined with the matters to be considered on remand.  Under those circumstances, the other issues will not be addressed by the court, but should be considered by the ALJ on remand in light of any revised findings.

### E.    Missing Exhibits

The court notes that the ALJ cited to exhibits 17F and 18F, relating to notes of the state agency mental health consultant who had determined that plaintiff had a severe disabling mental health impairment.  These exhibits, however, are not a part of the record before the court.  On remand, these exhibits should be added to the record.

## VI.    Plaintiff's Request for Remand with a Different Administrative Law Judge

On remand, plaintiff requested a different administrative law judge be ordered to conduct the review, claiming that the ALJ demonstrated a level of hostility toward her that would prohibit her from rehabilitating her credibility with respect to subjective levels of pain evidence.

There may be judicial review of bias claims under section 405(g).  Ventura v. Shalala, 55 F.3d 900, 901 (3d Cir. 1995) (citing Hummell v. Heckler, 736 F.2d 91 (3d Cir. 1984)).  The right to an unbiased judge is essential to a fair hearing and is a requirement applied more strictly in administrative proceedings than in court proceedings because of the absence of procedural safeguards normally available in judicial proceedings.  Id. at 902.  In Ventura, the administrative law judges's questioning of the claimant, as reflected on the transcript of the hearing, was found to have been "coercive and intimidating."  Id. at 903.  The administrative law judge's "offensive conduct prevented claimant from receiving a full and fair hearing and, therefore, a new hearing must be held before another [administrative law judge] to determine whether claimant is entitled to disability benefits."  Id. at 905.

In the instant case, the ALJ made comments which plaintiff argues show "insupportable assaults on plaintiff's credibility," during the hearing.  (Pl.'s Br. 43.)  Plaintiff does not identify the specific comments that she found offensive.  The court notes that the ALJ explained that one of the main reasons that he asked plaintiff about her use of marijuana and alcohol and her social activities with her daughter was because

> [he] used to do criminal cases and that [he] dealt with a lot of
> addicted people, and your work history is very similar to, you
> know, what a person, who's addicted to one substance or another
> looks like, okay, so you had, I think some really serious problems
> in the past.  I think you may have change your life, somewhat, but I

worry when I see somebody, you know, you got depressed one day, went out and bought yourself a six-pack and drank it all by yourself, that's a danger sign.. . .

. . .

[anybody who has been addicted to substances in the past is at great risk for getting addicted again . . . so if you can keep your head on straight, like that, you're going to do a lot better. Okay?

(R. at 332-34.)

The court, however, does not find that those or other comments rise to the level of coercion or intimidation that would preclude him from reconsidering, without prejudice, plaintiff's credibility. The court cannot conclude from a review of the record alone that the ALJ acted in a biased manner and at this time cannot conclude that a remand to a new administrative law judge is warranted. The court instructs the ALJ to reevaluate plaintiff's credibility in light of the consistency of her testimony at the hearing and the reports she made to her treating and examining medical and non-medical sources.

## VII. Conclusion and Instructions on Remand

Due to the inadequate explanation of the ALJ's findings at step two of the sequential analysis, it is necessary for the court to remand the case for further consideration. On remand, the ALJ should review all the pertinent medical evidence and if evidence is rejected, adequately explain his reasons for the rejection.

The ALJ is directed to address specifically the impact of the factual error in his opinion with respect to plaintiff's comments regarding her daily living activities – that she engaged in

karaoke not karate – and the diagnoses of plaintiff's treating and examining mental and physical physicians with respect to his findings related to plaintiff's RFC.

Dated: March 24, 2009                          By the court:

                                               /s/ JOY FLOWERS CONTI
                                               Joy Flowers Conti
                                               United States District Judge